## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Sami Ambar**
220 East 60th Street
Apt. 7K
New York, NY 10022

**Laila Ambar**
249 East 48th Street
Apt 4K
New York, NY 10017

**Shlomit Abrahamoff**
5/1 Tapuz Street
Pardes Hanna, 37089
Israel

**Ariela Nurit Abrahamoff**
Commelinstraat 45
1093TJ, Amsterdam
Holland

        *Plaintiffs*

*v.*

**The Federal Republic of Germany**
Berlin, Germany


        *Defendant*

Civil   Action   No.
_____

**Jury demand for any claims
that are triable by jury.**

## <u>COMPLAINT</u>

# I.    __INTRODUCTION__

This lawsuit stems from one of humanity's darkest moments. Approximately eighty years ago, the world witnessed what evil is capable of when six million Jews were systematically and methodically eradicated by the Nazi regime. The destruction of European Jewry could not have been complete without the bureaucratic and gross "thefticide"[1] of Jewish property. Indeed, an essential part of the "Final Solution" was to erase any memory of the Jews by transferring all Jewish property to the "Aryan" regime, all the while enriching the new illegal owners. Some property owned by Jews were simply sold by force to "Aryans." Other properties were simply taken by the Nazi regime outright.

This lawsuit seeks a long-awaited justice for compensation of Nazi theft of real-property – an apartment building in Berlin (the "Building" or the "Property")– that was owned by Plaintiffs' grandfather, Salo Feuerwerk. The Nazis stole the property in 1941 – at the peak of Nazi antisemitism in Germany and Austria– as part of its genocidal prerogative. After World War II, the Property was managed by the Communist regime in East Berlin and, after German Unification, was owned and managed by the Defendant.

Plaintiffs' never-ending attempts to receive restitution or other just compensation under the German legal system have been met with injustice and bureaucratic obstacles. Notwithstanding the Defendant's knowledge of the Feuerwerk Family's claims, it sold the property in 2006 and pocketed the proceeds, commingling them with its general revenue.

---

[1] Cotler I. *The Holocaust, 'Thefticide' and Restitution: A Legal Perspective*. In: Beker A. (eds) THE PLUNDER OF JEWISH PROPERTY DURING THE HOLOCAUST. Palgrave Macmillan, London (2001).

Germany's actions have been manifestly unjust, illegal and unsympathetic. Despite Germany's past declarations of its intent to restore Jewish property to its owners, this lawsuit is a living proof that these otherwise noble goals are still far from reality.

There is no treaty between Germany and the United States that bars or otherwise prevents Plaintiffs from receiving just compensation for their losses.

## II.   <u>PARTIES</u>

### A. <u>Plaintiffs- The Feuerwerk Family</u>

1. Salo Feuerwerk was a Jewish Austrian citizen who resided for most of his life in Vienna, Austria.  Salo was born on August 28, 1875 and died in what was then the British Mandate of Palestine ("Israel") on the eve of the Passover Jewish holiday, April 1, 1942.  As a result of Nazi persecution, he fled from Europe with his family to Israel in 1940.

2. Salo purchased the Building in 1924 which was subsequently stolen by the Nazis in 1941.

3. Salo Feuerwerk was married to Feige Lasarovici. Feige was born on November 15, 1886 in Romania and passed away on February 11, 1974 in the Netherlands.

4. Feige and Salo had two daughters, Ella Ambar ("Ella") and Therese Abrahamoff ("Therese").

5. Therese was born on February 12, 1914 in Czernowitz, Austria (now part of Ukraine) and died on August 5, 2000 in Tel-Aviv, Israel. Therese had two children, Shlomit and Ariela, who are plaintiffs in this lawsuit.

6. Ella was born on August 18, 1920 in Vienna, Austria and died on June 14, 2013 in Geneva, Switzerland. Ella had two children, Sami and Laila, who are plaintiffs in this lawsuit.

7. Upon Salo's death, domiciled in Mandatory Palestine (now the State of Israel), Feige inherited 51 percent of Salo's estate while Ella and Therese both inherited the remainder in equal portions under the Palestinian succession law then in effect.

8. Upon the death of Feige in 1974, domiciled in the Netherlands, Ella and Therese became her sole heirs, each inheriting half of her estate under the applicable law. Feige died intestate.

9. Plaintiff Sami Ambar is the grandson of Salo Feuerwerk and the son of Ella Ambar. Mr. Ambar is a United States citizen and a resident of the State of New York.

10. Plaintiff Laila Ambar is the granddaughter of Salo Feuerwerk (Sami Ambar's sister, second child of Ella). Ms. Ambar is a United States citizen and a resident of the State of New York.

11. Plaintiff Shlomit Abrahamoff is the granddaughter of Salo Feuerwerk, daughter of the late Therese Abrahamoff. Shlomit Abrahamoff holds Israeli and Dutch citizenship and is a resident of the State of Israel.

12. Ariela Nurit Abrahamoff is the granddaughter of Salo Feuerwerk, daughter of the late Therese Abrahamoff. Ariella Abrahamoff holds Israeli and Dutch citizenship and is a resident of the Netherlands.

13. The Plaintiffs, as well as their predecessors, are referred to in this Complaint collectively as the "Feuerwerk Family."

**B.  <u>Defendant</u>**

14. The Federal Republic of Germany ("FRG") is a foreign state as defined in the FSIA, 28 U.S.C. §1602 *et seq.*, at Section 1603(a). At the time of the theft of the Building by the Nazis, it was located in the territory within the *Deutsches Reich* (the German Reich), which expropriated the Building in violation of international law. Following WWII, the Building fell under the control of the German Democratic Republic. Following German Unification in 1990, the Building was managed by

the FRG, which is the successor state of the *Deutsches Reich* and the German Democratic Republic. The FRG formally took title to the Building in 2001, sold the Building in 2006 and retained the proceeds of the sale. During the entire period between 1938-2006, the Building generated rental income which was retained by the FRG and its predecessors.

### III.    JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1330, 1331, 1332, 1605 and 2201(a). The amount in controversy exceeds seven million ($7,000,000.00) dollars exclusive of interest and costs. For more detailed allegations regarding subject matter jurisdiction of this Court under the FSIA, see paragraphs 18-21 below.

16. This Court has personal jurisdiction under 28 U.S.C. §§1330(b) and 1605(a), and Rule 4(k)(2) of the Federal Rules of Civil Procedure ("FRCP").

17. Venue lies in this district pursuant to 28 U.S.C. §§1391(d) and (f)(4).

### IV.    DEFENDANT IS NOT IMMUNE FROM SUIT PURSUANT TO 28 U.S.C. §1605(A)(3)

18. Under 28 U.S.C. §1605(a)(3) of the FSIA, a foreign state shall not be immune from suit in any case:

> in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in commercial activity in the United States.

19. This action concerns rights in property *i.e.* the Building and the rents, taken by Defendant from Salo Feuerwerk.

20. The Building and the rents were taken by Defendant and its predecessors in violation of international law:

(A) The expropriation of the Building violated international law because it constituted a taking by a state of the property of a national of another state that: (1) was not for a public purpose; (2) was discriminatory, and (3) was not accompanied with just compensation.

(B) Alternatively, as asserted below and to be proven at trial, the taking(s) at issue in this matter were part of a program of systematic genocide to eradicate the Jewish nation and themselves were acts of genocide, committed in violation of international law.

(C) The expropriation of the Building also constituted a violation of international customary and treaty law, as evidenced by various sources, including, but not limited to:

    i. The International Covenant on Civil and Political Rights, adopted December 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force March 23, 1976) (ratified by the United States, June 8, 1992);

    ii. Article 8, Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, U.N. Doc. A/CONF. 193/9, reprinted in 37 I.L.M. 999 (1998), signed but not ratified by the United States;

    iii. The Charter of the International Military Tribunal, Nuremburg, of August 8, 1945, confirmed by G.A. Res. 3, U. N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946);

    iv. The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. Res. 2391 (XXIII), Annex, 23 U.N. GAOR, Supp.; No. 18, at 40, U.N. Doc. A/7218 (1968); and

v.     Principles of International Co-operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes Against Humanity, G.A. Res. 3074, U.N. GAOR, 28th Sess., Supp. No. 30A, U.N. Doc. A/9039/ Add. 1 (1973).

21. With respect to the requirement of section 1605(a)(3) of the FSIA that the expropriated property be present in the United States, Plaintiffs allege as follows:

(A) The FRG owned and/or managed the Building that it stole from the Feuerwerk Family during the Holocaust. From the moment of its expropriation in violation of international law, the Building was leased for residential and commercial use by the FRG and predecessors in exchange for periodic rental. These rents were collected by the FRG and its predecessors and commingled with its general revenue who then devoted the proceeds to funding various commercial operations.

(B) After selling the Building in 2006, the FRG mixed the resulting funds with its general revenue and devoted the proceeds to funding various commercial operations.

(C) The proceeds exchanged for the sale of the Building and the rents collected since its expropriation were commingled with the general revenues of the FRG. The FRG, in turn, is engaged in extensive commercial activity in the United States. Some or all of the funds generated from the lease of the Building following its illegal expropriation and the proceeds from the sale of the Building are present in the United States in connection with commercial activity carried on in the United States by the FRG. Some of those commercial activities include, but are not limited to, the following:

i.  The acquisition by the FRG of military equipment and military-related services, including but not limited to airplanes, munitions, electronics and armaments from the United States.

ii.  The significant commercial ties between the U.S. and Germany. According to the website of the German Federal Foreign Office[2], "close economic relations […] create jobs in, and foster exchange between, both countries. The United States was the biggest buyer of German exports in 2019, and Germany is the United States' most important trading partner in Europe."

iii.  German companies are the fourth largest foreign employer in the United States.

iv.  There are more than 200 German-American town twinning arrangements as part of cultural exchange between Germany and America.

v.  According to the website of the German Federal Foreign Office:

> In order to further intensify civil-society dialogue across the Atlantic, the Federal Foreign Office – in conjunction with the Goethe-Institut and the Federation of German Industries – conducted the *Deutschlandjahr* USA 2018/19 under the motto "Wunderbar Together." The initiative reached people all across the country, in all 50 states, with the aid of more than 1500 events. This commitment will extend into the future, as Germany remains engaged in the United States with its cultural and public relations activities.

vi.  According to the website of the U.S. Department of State,

> EU Member States are collectively the United States' biggest trading partner, and Germany, as Europe's largest economy, is at the heart of that relationship. After China and the United States, Germany is the world's third-largest exporter. Every fourth job in Germany depends on exports, which accounted for 47% of Germany's GDP in 2018 (almost four times the export share of U.S. GDP).

---

[2] https://www.auswaertiges-amt.de/en/aussenpolitik/laenderinformationen/usavereinigtestaaten-node/unitedstatesofamerica/218718.

https://www.state.gov/u-s-relations-with-germany/

vii. According to the same website, in 2018, "bilateral trade in goods and services totaled nearly $252 billion, with U.S. exports of $92.4 billion and imports of $159.8 billion. All of the $67.4 billion trade deficit in 2018 was in goods. Bilateral trade in services ($68 billion in 2018) is roughly in balance with a U.S. surplus of $1 billion (up from a $3 billion deficit in 2017)."

Major U.S. goods export categories to Germany in 2018 were:

(a) aircraft ($8.9 billion);

(b) vehicles ($7.2 billion);

(c) machinery ($6.9 billion);

(d) optical and medical instruments ($6.7 billion); and

(e) Electrical machinery ($5.5 billion).

Major categories of German exports to the United States in 2018 were:

(a) machinery ($27.2 billion);

(b) vehicles ($25.4 billion);

(c) pharmaceuticals ($15.3 billion);

(d) optical and medical instruments ($10.6 billion); and

(e) electrical machinery ($8.8 billion).

Upon information and belief, a significant amount of these transactions was done by and through the FRG.

*See* also https://www.census.gov/foreign-trade/balance/c4280.html.

viii. The FRG maintains large U.S. dollar deposits with commercial U.S. banks in New York.

9

ix.     The FRG sells and purchases U.S. Treasury Bonds and Notes and is one of the largest foreign holders of U.S. debt. As of September 2020, Germany owned almost $75 billion worth of U.S. debt[3];

x.      Upon information and belief, a significant amount of this debt is owned directly by the FRG.

xi.     In addition to purchasing and trading U.S. treasury bonds, the FRG also obtains financing through issuance of German bonds and other financial instruments to U.S. investors.

xii.    According to estimates by the OECD, every year the FRG and municipalities procure services amounting to at least EUR 500 billion or 15 % of GDP.[4] The FRG procures the goods and services of U.S.-based firms. *See*, in general, https://www.trade.gov/country-commercial-guides/germany-selling-public-sector.


## V.     FACTS

### A.  The Nazis Rise to Power

22. On January 30, 1933, Adolph Hitler was appointed Chancellor of Germany, the head of government, by the President of the *Deutsches Reich* [5], Paul von Hindenburg, the Head of State. On March 23, 1933, the German Parliament (the *Reichstag*) met in the Kroll Opera House in Berlin and

---

[3] *See*: https://www.federalreserve.gov/data/secholdtrans/treasurybondsnotes20201031.htm.

[4] OECD (2019), Public Procurement in Germany: Strategic Dimensions for Well-being and Growth, OECD Public Governance Reviews, OECD Publishing, Paris, https://doi.org/10.1787/1db30826-en.

[5] From 1918 until the coming of the Nazis to power in 1933, the *Deutsches Reich* was a federal republic known as the Weimar Republic.

passed Hitler's Enabling Act, effectively ending democracy in Germany and establishing the Third Reich.

23. The Nazi Party then began to eliminate all political opposition and consolidate its power. Hindenburg died on August 2, 1934 and Hitler became sole dictator of Germany by merging the offices and powers of the Chancellery and Presidency.

24. Immediately after Hitler and the Nazis' rise to power, antisemitism became the central ideological policy of the regime. The persecution of Jews began in earnest after the seizure of power. The first concentration camps, such as Dachau, were established in 1933. Jews and others deemed undesirable were imprisoned, killed, or exiled.

25. On April 1, 1933, Hitler declared a national boycott of Jewish businesses. The Law for the Restoration of the Professional Civil Service, passed on April 7, 1933, forced all Jews to retire from the legal profession and civil service. Similar legislation soon deprived other Jewish professionals of their right to practice.

26. On April 11, 1933, a decree was promulgated under which anyone who had even one Jewish parent or grandparent was considered non-Aryan.

27. As part of the drive to remove Jewish influence from cultural life, members of the National Socialist Student League removed from libraries any books considered un-German.  A nationwide book burning – including many Jewish works – was held on May 10, 1933.

28. The regime used violence and economic pressure to encourage Jews to leave the country. Jewish businesses were denied access to markets, forbidden to advertise, and deprived of access to government contracts. Citizens were harassed and subjected to violent attacks. Many towns posted signs forbidding entry to Jews.

**B.  The Nazis Enact the Nuremberg Laws**

29. At their annual party rally held in Nuremberg in September 1935, the Nazi leaders announced a set of new laws to further regulate and exclude Jews from German society. These laws, known as the Nuremberg Laws, served as the legal predicate for future mass arrests and violence against the Jews of Germany.

30. One of the laws, the "Reich Citizenship Law" stripped Jews of their German citizenship and introduced a new distinction between "Reich citizens" and "nationals." According to the law, citizenship rights were to be granted to those who were citizens of the Reich, who could be classified as being of "German or related blood."  Jews were excluded from all citizenship rights, and became *Staatsangehörige*, state dependents, essentially making them foreigners in their own country. Article 2 of the Reich Citizenship Law read as follows:

A.  A citizen of the Reich is that subject only who is of German or kindred blood and who, through his conduct, shows that he is both desirous and fit to serve the German people and Reich faithfully.
B.  The right to citizenship is acquired by the granting of Reich citizenship papers.
C.  Only the citizen of the Reich enjoys full political rights in accordance with the provision of the laws.[6]

31. A second law was entitled the "Law for the Defense of German Blood and Honor."  This law forbade marriage and any intimate extramarital relations between Jews and non-Jews.  While the law left existing marriages between non-Jewish and Jewish spouses untouched, it banned future such marriages and declared marriages by a non-Jewish German and a Jewish spouse of any nationality contracted after that ban outside of Germany invalid within the Reich.

---

[6]A translation of the law can be found on https://www.jewishvirtuallibrary.org/law-for-the-protection-of-german-blood-and-german-honor, based on Noakes, Jeremy, and Geoffrey Pridham. **Documents on Nazism** 1919-1945. NY: Viking Press (1974), at 463-467,

32. Furthermore, under this law, Jews were forbidden from employing non-Jewish German women or women of equivalent racist ranking who were under 45 years old. Under this law, Jews were also forbidden to raise the then German Flag.[7]

33. After the Nuremberg Laws were passed, the Nazi Party also introduced supplemental decrees to the Reich Citizenship Law and the Law for the Defense of German Blood and Honor to specifically outline who would be considered a Jew, and who would therefore be subject to the Nuremberg Laws' exclusionary principles.

34. The following is a non-exhaustive sampling of post-Nuremberg Law decrees and laws the purpose of which was to systematically destroy the Jews, both economically and as a people:

(1)    De-certification of all Jewish physicians, who were no longer allowed to treat German patients and forced to refer to themselves as "sick-treaters";

(2)    January 5, 1938: Law on the Alteration of Family and Personal Names forbids Jews from changing their names;

(3)    February 5, 1938: Law on the Profession of Auctioneer excludes Jews from this occupation;

(4)    March 18, 1938: The Gun Law excludes Jewish gun merchants.

(5)    March 22, 1938: Jews were forbidden from owning private gardens;

(6)    April 22, 1938: Jewish-owned businesses were forbidden from changing their names;

(7)    July 11, 1938: Jews were banned from health spas;

---

[7] A translation of the law can be found on https://www.jewishvirtuallibrary.org/law-for-the-protection-of-german-blood-and-german-honor, based on Noakes, Jeremy, and Geoffrey Pridham. **Documents on Nazism** 1919-1945. NY: Viking Press (1974), at 463-467,

(8)     August 17, 1938: All Jews had to adopt new given names, for women, "Sara," and for men, "Israel";

(9)     October 3, 1938: Decree on the Confiscation of Jewish Property regulates the transfer of assets from Jews to non-Jewish Germans;

(10)     October 5, 1938: The Nazi Interior Ministry invalidates all German passports held by Jews. Jews must surrender their old passports, which will become valid only after the letter "J" had been stamped on them;

(11)     November 12, 1938: Jews were forbidden from attending movie theaters, the opera, and concerts;

(12)     November 15, 1938: Jewish children barred from attending public school;

(13)     November 28, 1938: The Nazi Ministry of Interior restricts the freedom of movement of Jews;

(14)     December 14, 1938: An Executive Order on the Law on the Organization of National Work cancels all state contracts held with Jewish-owned firms;

(15)     December 21, 1938: Law on Midwives bans all Jews from the occupation.

(16)     February 21, 1939: Jews were forced to turn in all jewelry of any value.

*See* also:

https://encyclopedia.ushmm.org/content/en/article/anti-jewish-legislation-in-prewar-germany.

35. On March 12, 1938, the Third Reich illegally invaded and annexed Austria, an act known as the *Anschluss*. After the *Anschluss,* Austria ceased to exist as a legal entity and German law applied in the territory of what had been Austria. Jews in Austria were now subject to the German anti-sematic citizenship laws.

36. A little more than a month later, on April 26, 1938, in the midst of this wave of antisemitic legislation, the Third Reich also enacted the so-called "Decree for the Reporting of Jewish-Owned Property"[8] (the "Nazi Reporting Decree"). This new discriminatory and anti-Jewish regulation required all Jews in both Germany and Austria to register with the Third Reich any property or assets valued at more than 5,000 *Reichsmarks* (around $2,000 in American currency of the period, or $34,000 today). From furniture and paintings, to life insurance and stocks, nothing was exempt from registration, including and especially real estate.

37. Failure to file the report resulted in "severe punishment (monetary penalty, prison, penitentiary, confiscation of the property)."[9]

38. The Nazi Reporting Decree became immediately effective in Austria.

39. For Austrian Jews, asset reports submitted by Jews pursuant to the Nazi Reporting Decree were filed with the Property Transaction Office (*Vermögensverkehrsstelle*) ("VVSt") in Vienna. The VVSt was established on May 18, 1938 to assist in the implementation and execution of the Nazi Reporting Decree and the subsequent mass theft and Aryanization of Jewish property. The establishment of the VVSt went back to a speech by Hermann Goring, who, on March 28, 1938, demanded that measures to divert the Jewish economy should be taken calmly and orderly to ensure proper implementation of the de-Jewification process.

40. By July 31 of that year, German finance officials had collected paperwork from some 700,000 Jews, including those residing in what used to be Austria — covering some 7

---

[8] An English translation of the decree can be found on https://alphahistory.com/holocaust/decree-reporting-jewish-owned-property-1938/. The decree was issued by the "Deputy for the Four Year Plan," Goering, General Field Marshal and the "Reich Minister of the Interior," Wilhelm Frick.
[9] This language, translated from the German, was taken from the standard form that Jews were required to fill out pursuant to the Nazi Reporting Decree.

billion *Reichsmarks* of Jewish property, (approximately $2.8 billion, $47.6 billion in current value), all of which immediately was exposed to confiscation by the German state.

### C.  Salo Feuerwerk Purchases the Building and the Third Reich Expropriates it

41. In 1924, prior to the Hitler's rise to power, Salo Feuerwerk, then an Austrian citizen, purchased a 15-unit apartment building located at Lottumstrasse 15, in the Prenzlauer Berg district of Berlin, Germany. The Building stands to this very day. *See* photograph of the Building, as it stood in 2012:



42. The Building has a total of 15 units, 14 of which are residential and one that is commercial, located on the ground floor. The usable, rentable floor area totals 13,132 square feet; the floor area totals 18,298 square feet. As the above photograph indicates, the Building is in good condition. Unlike many buildings in East Berlin, it was also in good condition in 1990, at the time of reunification.

43. Salo owned the entire Building and was registered as the sole owner in the German Land Registry, known as the *Grundbuch*. The following is an excerpt from the *Grundbuch* as of December 9, 1991:



*Salo Feuerwerk, Merchant, from Vienna…* Notice that the *Grundbuch* adds the name "Israel" to Salo Feuerwerk. *See* above, regarding the Nazi law that all Jewish men were required to add "Israel" to their name.

*…Purchased August 14, registered on October 30, 1924.*

44. Between 1924-1937, Salo collected rents from the Building; 1937 was the last year Salo received rent from the Building.

45. As a result of rising political instability, instigated by Germany and sensing impending danger, Salo (alone) fled Vienna to Bucharest, Romania in September 1937. Salo intended to return to Vienna, where his wife and daughter, Therese (who was studying medicine at the University of Vienna) remained. However, he soon realized that returning was too dangerous. Salo began insisting that his wife and daughters join him in Romania. While initially reluctant to relocate, Salo's wife and daughter, Therese, finally joined him in Bucharest towards the end of February 1938, shortly before the *Anschluss*. Ella, who was attending a boarding school in Switzerland since October 1937, joined the family one week after the *Anschluss* in March 1938.

46. In Bucharest, Salo received information about the antisemitic developments in Austria and Germany including reports that Jewish men were being deported to the Dachau and Buchenwald Concentration Camps and some murdered.

47. Pursuant to the Nazi Reporting Decree (as defined above), Salo was required to complete an asset report and submit it to the VVSt in Vienna. On July 23, 1938, the *Geheime Staatspolizei*

(Gestapo) arrived at Salo's apartment, office and warehouse in Vienna (the purposes of this "visit" are unclear. However, it seems clear that had Salo been at his apartment, office or warehouse at the arrival of the Gestapo, he would have been arrested).

48. After realizing that Salo was not there, the Gestapo sealed his apartment, warehouse and office.

49. A couple days later, on July 27, 1938, Salo wrote to the VVSt a letter pleading with them for an extension to file his asset report, which was due on July 31, 1938. Salo explained that due to the Gestapo's sealing of his apartment, warehouse and office, he could not have the documentation required to complete the report sent to Bucharest. Salo asked that he be allowed to file the report by September 30.

50. On August 4, 1938, a representative of the VVSt responded to Salo's request, allowing him to "complete the registration of assets within a period of 14 days following the release of the apartment, the office and the warehouse."

51. Almost a year went by after Salo's apartment, office and warehouse were released until he completed and submitted the asset report. Salo was required to hire professional appraisers to value his assets, both moveable and immovables.

52. On or around May 16, 1939, Salo completed the report, listing the Building, and submitted it to the VVSt:

| II. Grundvermögen (Grund und Boden, Gebäude) (vgl. Anleitung Ziff. 10): Wenn Sie am 27. April 1938 Grundvermögen besaßen (Grundstücke, die nicht zu dem vorstehend unter I und nachstehend unter III bezeichneten Vermögen gehörten): | | | |
|---|---|---|---|
| Lage des Grundstücks? (Gemeinde, Straße und Hausnummer, bei Bauland auch grundbuch- und katastermäßige Bezeichnung) | Art des Grundstücks? (z. B. Einfamilienhaus, Mietwohngrundstück, Bauland) | Wert des Grundstücks? RM | Wenn das Grundstück noch Anderen gehörte: Wie hoch war Ihr Anteil? (z. B. ¼) |
| 1 | 2 | 3 | 4 |
| Wien XIX., Zahnradbahnstr.3 | Miethaus | 27.982.-- | |
| Berlin, Lottumstr. 15 | Miethaus | 63.200.-- | |

[An excerpt from the original report filed by Salo Feuerwerk. The Building appears on the second line and was valued at the time at 63,200 Reichsmarks, equivalent to approximately $25,000 ($429,000 at current value). Salo also reported his property in Vienna which was Aryanized in August 1939 when it was sold (*i.e.* Aryanized ) by the Third Reich to a certain Franz Stussak].

53. On June 28, 1939, the VVSt forwarded Salo's completed asset report to the "Moabit Tax Office" in Berlin. See immediately below, from the original cover letter of the VVSt to the Moabit Tax Office, translated from the German:

Salo Feuerwerk, Bucharest, Sosea Colentia 82, born 8/28/1875.

The Property Transactions Office [Vermögensverkehrsstelle], Property Registration Department [Abteilung Vermögensanmeldung], for reasons of competence hereby sends you the List Concerning the Assets of Jews as of April 27, 1938, for the Jew Salo F e u e r w e r k, Bucharest, Sosea Colentia 82, together with all associated attachments.

Heil Hitler!

The Director of the Property Transactions Office
By:
[Signature]

1 list of assets

54. A couple of months later, on September 1, 1939, Germany invaded Poland.

55. Fearing for their lives, Salo and his family eventually fled Bucharest to what was then the British Mandate of Palestine in March and November 1940 (Salo and Feige arrived in March; Ella and Therese arrived in November).

56. Salo and his family took with them what they could, but most of their assets and properties remained in Europe.

57. The Nazi regime officially expropriated the Building on or about November 27, 1941. The Nazi regime recorded its ownership in the German Land Registry, the *Grundbuch*, on January 8, 1942, Folio Number 02924:



[An excerpt from the *Grundbuch* as of December 9, 1991]

The translation is as follows:

| The German Reich, represented by the Berlin Oberfinanzpräsident (Chief Finance President) | By reason of the declaration of forfeiture [Verfallserklärung] published in the Reichsanzeiger no.219 of September 19, 1941 at the request of the tax office of [the Berlin District of] Moabit-West of November 27, 1941 registered on January 8, 1942.<br><br>Signed Maass                    Grützmacher |
|---|---|

58. Upon information and belief, the Nazi regime collected rents from the Building during the time it was illegally in its possession or control, from 1938-1945.

### D. The German Democratic Republic Takes Control of the Property

59. On May 8, 1945, Germany unconditionally surrendered, marking the end of World War II.

60. From July 17 to August 2, 1945, the Allied Powers met at the Potsdam Conference. During the conference, the Allies divided Germany into four military occupation zones — France in the southwest, Britain in the northwest, the United States in the south, and the Soviet Union in the east.

61. The Allies also divided what had been the capital city of Berlin into four sectors, analogous to the occupation zones into which Germany as a whole was divided. The sectors of the Western Allies (the United States, the United Kingdom and France) formed "West Berlin", while the Soviet sector formed "East Berlin."

62. In 1949, the Federal Republic of Germany was established and eventually included all of the American, British and French zones, excluding those three countries' zones in Berlin. Around the same time, the German Democratic Republic ("GDR") was proclaimed in Soviet-controlled eastern Germany.  The Building was located in the Soviet zone in East Berlin and was formally incorporated into the GDR.

63. While the GDR existed, the Building was managed by the East Berlin Housing Administration, an administrative agency of the GDR.  The GDR did not title the Building in its name or otherwise transfer the Building.

64. Rather the GDR placed the Building (and other Jewish property that was stolen by the Nazis) on what is known as the "C-List."

65. Upon information and belief, the GDR collected rents from the Building during the time that it was listed on the C-List until its merger with West Germany in 1990.

**E.   The Unification of East and West Germany**

66. On August 31, 1990, the GDR and FRG signed the *Treaty between the Federal Republic of Germany and the German Democratic Republic on the Establishment of German Unity* (the "Unification Treaty").

67. Following the unification of Germany, the FRG was listed as the owner of the Building in the *Grundbuch,* as of July 18th, 2001, Folio Number 14786N.

68. After unification, the Building was managed on behalf of the FRG by the Federal Property Administration (*Bundesvermögensverwaltung*), a German federal agency ("FPA"), until January 1, 2005. At that time, the FPA was dismantled and the Institute for Federal Real Estate (*Bundesanstalt für Immobilienaufgaben*) was established, taking over the management of the Building on behalf of the FRG.  The Institute for Federal Real Estate is part of and controlled by the German Ministry of Finance.

69. Upon information and belief, from 1990 until the ultimate sale of the Building (*see* below), rents from the Building were collected by the FRG.

**F.   The FRG Sells the Building**

70. In or around 2002, the FRG issued a document entitled an "INVITATION FOR BIDS BY THE FEDERAL REPUBLIC OF GERMANY FOR THE REAL PROPERTY LOTTUMSTR. 15, CORNER OF CHORINER STR. IN BERLIN-PANKOW, SUB-DISTRICT OF PRENZLAUER BERG". In the tender documents, the FRG is listed as the owner ("*Eigentümer*") of the Building.

71. On January 3, 2006, four years after the Building was offered for sale, it was finally sold. At that time, the Building was valued at  approximately U.S. $1.4 million. The funds from the sale were deposited with the FRG and were subsequently commingled with the general revenue of the FRG.

72. Upon information and belief, the Building is currently valued at approximately U.S. $7 million.

**G.   The Feuerwerk Family's Attempts to Achieve Justice**

73. Jewish victims of Nazi-era thefticide had high hopes that post-war governments would rectify the crimes of the past and return their property or, at the very least, provide fair compensation. These hopes were reinforced by representations made by European leaders at the time, including FRG Chancellor Konrad Adenauer who stated in a September 27, 1951 *Bundestag* (parliament) speech that "unspeakable crimes were perpetrated which impose upon them the obligation to make moral and

material amends, both as regards to the individual damage that Jews have suffered and as regards to Jewish property." *Cited* in Marilyn Henry, *Fifty Years of Holocaust Compensation*, THE AMERICAN JEWISH YEAR BOOK, Vol. 102 (2002), at pg. 14.

74. Unfortunately, for the Feuerwerk Family, these hopes proved to be in vain.

## H.  **The Austria-GDR Reparations Treaty**

75. In 1987, several years prior to the GDR's dissolution and unification with the FRG, the Republic of Austria and the GDR entered into the *Treaty between the Republic of Austria and the German Democratic Republic on the Settlement of Open Questions Relating to Property Rights* (the "Austria-GDR Treaty").[10]  Under the Treaty, the GDR undertook to set aside 136.4 million Austrian

---

[10] The GDR ceased to exist on October 3, 1990 when it officially became part of the FRG. Under general principles of international law, where one state voluntarily decides to be incorporated into another, as was the case with the GDR, the former ceases to exist as a subject of international law, while the territory of the latter extends to that of the incorporated state. In such a scenario the treaties of the incorporating State extend to the absorbed territory while the treaties of the incorporated State, with the notable exception of localized treaties, *ipso facto*, lapse unless the parties involved decide otherwise. Andreas Zimmermann, *State Succession in Treaties*, MAX PLANCK ENCYCLOPEDIAS OF INTERNATIONAL LAW (2006).

In the case of German unification, unified Germany reserved the right to determine its position with the regard to bilateral treaties entered into by the GDR. Konrad Buhler, STATE SUCCESSION AND MEMBERSHIP IN INTERNATIONAL ORGANIZATIONS: LEGAL THEORIES VERSUS POLITICAL PRAGMATISM, Springer; 1st Edition (February 8, 2001), at 143 ("BUHLER"). As a result, approximately eighty-five percent of 2,600 GDR treaties were declared by Germany as having lapsed.

The Austria-GDR Treaty was an exception to the unified Germany's general policy of allowing GDR treaties to expire. Thus, during negotiations between Austria and unified Germany held on February 26 and 27, 1990, both states noted the following (from BUHLER, at 145-146):

With respect to the Treaty between the Republic of Austria and the German Democratic Republic on the Settlement of Open Questions Relating to Property Rights, the German side proceeds from the fact that this Treaty continues in force. Also the Austrian side proceeds from the continuation of this Treaty. In this context*, however, the Austrian delegation points out that in view of the fundamental change of circumstances the fact that Austria has concluded a Treaty with the German Democratic Republic on questions relating to property*

Schillings ("ATS") (approximately U.S. $12 million) for Austrian citizens whose property in the territory of the GDR "is now administered by the State or, as a result of other measures passed by the German Democratic Republic, has fallen under its exclusive power of disposal." Austria-GDR Treaty, §1.

76. The Austria-GDR Treaty applied only to individuals who were Austrian citizens on May 8, 1945. In addition, the Treaty did not apply to properties that were expropriated between March 13, 1938 to May 8, 1945. Therefore, under the Treaty, the Feuerwerk Family was not entitled to compensation because the Building was expropriated by the Nazi Regime in 1941. Moreover, none of the members of the Feuerwerk Family held Austrian citizenship on May 8, 1945, nor could they have because Austria did not allow dual citizenship. Ella regained her Austrian citizenship in 1957.

77. Notwithstanding the above, Ella's name appeared in an appendix to the Treaty specifically including her. Ella's mother, Feige (who passed away in 1974), and sister, Therese, who did not hold Austrian citizenship, were not specifically mentioned in the Treaty or the side letter.

78. While Austria transferred to Ella a nominal/symbolic award, Ella rejected the proffered compensation as being grossly inadequate and discriminatory. In addition, the nominal/symbolic award was deficient even under the unfair terms of the Austria-GDR Agreement: At the time of German reunification in 1990, Ella had only received 70% of the award she was supposed to have received in full in 1989. Ultimately, in 2000 Ella received an additional installment. However, this final installment

---

*rights cannot lead to the conclusion that claims of Austrian nationals in this context can be generally precluded. The Austrian side rather proceeds from the assumption that the Federal Republic of Germany will take measures to prevent Austrian nationals from being treated less favorably than its own nationals and those of third States. Moreover, the Austrian side reserves the right to enter into negotiations with the Federal Republic of Germany in case and at the time of any such less favorable treatment.*

Emphasis added.

was also deficient even under the unfair terms of the Austria-GDR Agreement: the total amount Ella received was only 84% of what she was supposed to have received.

79. For a variety of reasons, the Austria-GDR Treaty does not preclude Plaintiffs from commencing this action or from otherwise seeking the relief sought here.

## I.   Additional Administrative Attempts to Retrieve the Building under the VermG

80. Prior to the unification of Germany in 1990, no restitution regime had been established for property located in the GDR that was confiscated during the Nazi era. An estimated 45,000 pieces of real-estate and 10,000 businesses had been Aryanized/expropriated by the Nazis during World War II in what became East Germany.

81. In 1990, prior to unification with the FRG, the GDR passed the Act of the Settlement of Open Property (*Vermögensgesetz*- VermG).  The purpose of this law was to recognize the private ownership of property, a right that had been abolished during the period of Communist rule in the GDR.

82. After the dissolution of the GDR, the VermG became applicable to the whole of Germany under the Unification Treaty.[11] A 1992 amendment to the VermG added provisions to assist with restitution for victims of Nazi persecution. These amendments provided that victims of Nazi persecution were entitled to restitution even if their property had later been expropriated under Soviet/GDR rule. The VermG applied to restitution only, *i.e.* the physical return of property.

83. A related FRG law, the Compensation and Adjustment Payments Act, enacted in 1994, contained a separate compensation statute – the Nazi Persecution Compensation Act – for properties

---

[11] The VermG was incorporated as Annex II to the *Treaty on the Establishment of German Unity* (Chapter III, Sect. B. I, No. 5 to the Treaty).

taken between 1933-1945 ("Compensation Act"). A claimant could only file a claim under the Compensation Act if a successful restitution claim had been filed under the VermG.

84. The VermG included several exceptions to the right of restitution. One exception was for foreigners (*i.e.* non-Germans) who had been compensated through lump sum agreements. This post-unification restitution regime was implemented through administrative law proceedings. Claims were submitted to "Open Property Offices."

85. On September 19, 1990, Ella filed an application with the Berlin Open Property Office, AROV, Section F, for *restitution* of the Building (the "1990 Petition"). On February 25, 1992, the Agency rejected the 1990 Petition. (the "1992 Decision"). The 1992 Decision stated the following:

> The Berlin-Prenzlauer Berg, Lottumstr. 15 , real property which was registered by your client Ms. Ella Ambar, residing at 4 Rue Pedro Meylan, 1208 Geneva/Switzerland, for reversion of a transfer of property was already covered by the treaty between the former German Democratic Republic and the government of the Republic of Austria. The German Act on the Settlement of Open Property Issues *[Gesetz zur Regelung offener Vermogensfragen;* "VermG"] does not apply in this case, in accordance with Section l(8b).[12]
>
> This was settled conclusively and with finality in the aforementioned treaty of 08/21/1987 and the exchange of notes on 08/21/1987.

86. On March 9, 1992, Ella, through counsel, requested from the Open Property Office an extension to file an opposition to the 1992 Decision. In the same letter, counsel for Ella took the following position:

> Section 1(8b) VermG is not applicable to the combination of circumstances on hand here Property claims by Ms. Ambar could not be settled with finality or indeed be discharged – without her involvement - by either the property agreement or by the exchange of notes between the foreign ministers of the two states.

---

[12] Translated from the German (Google Translate), Section 1(8b) of the VermG reads as follows:

> Subject to its provisions on competences and procedures, this Act does not apply to […] property rights that were regulated by the German Democratic Republic through intergovernmental agreements.

> It remains to be stated that my client has never waived her claims under private law and that the entitlement to compensation, insofar as it ever existed, was in any event of a public law nature and therefore could not have given effect to any waiver of claims under private law.

87. On April 4, 1992, Ella, through counsel, filed an opposition to the 1992 Decision. Ella contended that the Austria-GDR Treaty did not apply to her because she did not hold Austrian citizenship on May 8, 1945, and because the Building was expropriated between 1938-1945, two of the conditions for the Treaty's application.  The letter goes on to state that the May 29, 1989 notice by the Regional Dep't of Finance For Vienna specifically noted Ella's rejection of the offer under the Austria-GDR Treaty and that the award by Austria did not conform to the Austria-GDR Treaty.

88. On April 29, 1992, the Open Property Office denied Ella's opposition.

## J.  Additional Attempts to Retrieve the Property: 1992-1996

89. In 1992, the Austrian Constitutional Court adjudicated an unrelated case that involved the Austria-GDR Treaty.  In its decision, the court ruled as follows:

> […] the Republic of Austria has not thereby relinquished any rights whatsoever on behalf of its citizens. Thus, the latter remain free as ever to assert in Germany any possible claims for full compensation or for restitution in kind with regard to assets taken from them under the former German Democratic Republic, if so provided by German law.

90. The foregoing decision was brought to Ella's attention by her previous attorney, Dr. Thomas Mondl. Dr. Mondl also referred to the Austrian declaration during the 1990 negotiations (*see* above, fn. 10), which also implies that the Austria-GDR Treaty should not preclude Austrian citizens from receiving restitution or fair compensation.

91. Notably, in 1994, a different Open Property Office, AROV V, Section D- Foreign Assets, responded to a letter of Ella and took a different position as to the VermG's application and scope.

According to this letter, Ella's inclusion in the Austria-GDR Treaty did not bar her from the restitution regime of the VermG. According to this Open Property Office, Ella was entitled to restitution under section 1(6) of the VermG "which gives rise to a claim of restitution under the Vermögensgesetz and cannot be excluded again by Section 1(8b) VermG." The Open Property Office went on to write that in "this Agency's view, it would constitute an inexplicable evaluative inconsistency if a loss of property related to persecution as defined in Section 1(6) VermG that was compensated based on the interstate agreement results in the exclusion of the applicability of the Vermögensgesetz under Section 1(8b) VermG." This Open Property Office recommended that the Building be returned, subject to approval of the Ministry of Justice.

92. Subsequently, a meeting was arranged between Ella's attorney and the then German Minister of Justice, Sabine Leutheusser-Schnarrenberger. During the meeting, Ella's attorney was told that the decision to return the Building depended on the approval of the German Minister of Finance at the time, Theo Waigel. Minister Theo Waigel refused to approve the return of the Building to Ella.

93. Thereafter, in April 1996, Plaintiff Ambar, on behalf of Ella, petitioned the German *Bundestag* (parliament) for the return of the Building. On July 22, 1996, a certain Dr. Quantz, an official in the German Ministry of Finance, writing on behalf of the *Bundestag*, denied the petition based on same grounds as the Open Property Office in 1992, namely, that the Austria-GDR Treaty precluded Ella from getting the Building returned.

## K. **The German Lawsuit**

94. In or around 1997, Ella and Therese filed an administrative complaint under the VermG, challenging the Open Property Office's April 29, 1992 decision and demanding return of the Building (the "German Lawsuit"). The German Lawsuit was filed in the Berlin Administrative Court. The

Regional State of Berlin was named as the defendant/respondent.  Ella and Therese claimed that they

were entitled to restitution of the Building under the VermG.

95. Oral argument/pre-trial conference was held on February 15, 2000.  During the hearing,

the German court made clear that the Austria-GDR Treaty prevented Ella and Therese from recovering

the Building under the VermG.  Subsequently, Ella and Therese voluntarily withdrew their petition,

prior to any decision on the merits by the Administrative Court.

96. As a result of the termination of the lawsuit, the *Grundbuch* was amended and the FRG

was recorded as the owner of the Building on July 18, 2001.


## VI.    THIS SUIT IS TIMELY FILED

97. No limitations period should be imposed on the prosecution of this action, due to the

heinous and unprecedented quality of the wrongdoing giving rise to this action, and for the same

reasons that no limitations period is imposed on criminal prosecutions for the violations of international

law, war crimes and crimes against humanity alleged herein. *See*, *e.g.*, the Convention on the Non-

Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. Res. 2391

(XXIII), Annex, 23 U.N. GAOR, Supp.; No. 18, at 40, U.N. Doc. A/7218 (1968).

98. Alternatively, the Complaint is timely filed under the continuing wrong doctrine. Under

this doctrine the limitations period does not begin to run until the last wrongful act occurs. Here,

Defendant's ongoing failure to return the Building or compensate for the same, constitute deliberate,

continuous and ongoing violations of international and domestic law. These violations continue to this

day.

99. In addition, Defendant is estopped to raise limitations or laches as a defense for the further

reason that the FRG actively lulled Plaintiffs into allowing any otherwise applicable statute(s) of

limitations to expire. Defendant did this through a series of legislative enactments, remedial statutes

and representations (as discussed at length above) that held out the false promise of providing Plaintiffs with adequate compensation.

100. Additionally, Defendant is estopped to raise any defense of laches due to its own manifestly unclean hands as alleged hereinabove. The elements of laches cannot be met for the further reason that Defendant has benefitted, rather than suffered injury, by virtue of any failure on the part of Plaintiffs to bring this suit sooner.

## VII.   COUNTS

### COUNT I
### INTERNATIONAL EXPROPRIATION

101. Plaintiffs incorporate by reference all the allegations above.

102. Under international law, a state is responsible for injury resulting from a taking by the state of the property of a national of another state that: (1) is not for a public purpose, or (2) is discriminatory, or (3) is not accompanied with just compensation.

103. At the time of the taking of the Building, Salo Feuerwerk was not a citizen of Germany.

104. The taking of the Building was not for a public purpose, it was discriminatory and it was not accompanied by just compensation.

105. Accordingly, the taking of the Building constituted an international expropriation by a state against a non-citizen, thus violating international law.

106. Defendant is the successor state of the Third Reich and the GDR.

107. Accordingly, Defendant FRG is liable towards Plaintiffs for the expropriation of the Building.

### COUNT II
### GENOCIDE IN VIOLATION OF THE LAW OF NATIONS

108. Plaintiffs incorporate by reference all the allegations above.

109. Customary international law defines genocide as any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:

(i)     Killing members of a group;

(ii)    Causing serious bodily or mental harm to members of a group; [or]

(iii)   Deliberately inflicting on a group conditions of life calculated to bring about its physical destruction in whole or in part ...

110. *See* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, §702 (1987). The offense of genocide under U.S. law uses the same definition. *See* 18 U.S.C. §1091(a) (defining the crime of genocide).

111. The systematic and methodical expropriation of Jewish property with aim to eradicate and "purify" Germany – coupled with the parallel attempt to physically destroy the Jewish nation – constitutes Genocide in violation of the law of nations.

112. The taking of the Building by the Nazis' was no different than the Nazis' mass plunder of Jewish property throughout Europe, the purpose of which was to further the regime's genocidal agenda.

113. Defendant is the successor state of the Third Reich and the GDR.

114. Accordingly, Defendant FRG is responsible for the genocidal taking of the Feuerwerk Family's Building.

115. The FRG never compensated the Feuerwerk Family for the expropriation of the Building.

116. Therefore, the FRG must compensate the Feuerwerk Family for the genocidal taking of the Building, including any benefits it reaped while the Building was in its possession and ownership.

## COUNT III
## CONVERSION- PROCEEDS OF THE SALE

117. Plaintiffs incorporate by reference all the allegations above.

118. Plaintiffs owned and had the right to sell the Building and collect the proceeds. The proceeds of the sale of the Building were taken from them by Defendant, as described hereinabove, and never returned to them; nor were Plaintiffs compensated for the illegal taking of the proceeds.

119. Defendant is the successor state of the Third Reich and the GDR.

120. Defendant FRG and its predecessors' actions were intentional and in violation of applicable law, including international law.

121. Defendant's unlawful actions caused severe injury and damages to Plaintiffs.

## COUNT IV
## CONVERSION- RENTAL INCOME

122. Plaintiffs incorporate by reference all the allegations above.

123. Plaintiffs owned and had the right to collect the rents generated by the Building. The rents were taken from them by Defendant, as described hereinabove, and were never returned to them. Plaintiffs were never compensated for the illegal misappropriation of the rental income by the Defendant.

124. Defendant is the successor state of the Third Reich and the GDR.

125. Defendant FRG and its predecessors' actions were intentional and in violation of applicable law, including international law.

126. Defendant FRG and its predecessors' unlawful actions caused severe injury and damages to Plaintiffs.

## COUNT V
## UNJUST ENRICHMENT-  PROCEEDS OF THE SALE

127. Plaintiffs incorporate by reference all the allegations above.

128. Plaintiffs were deprived of the proceeds of the 2006 sale of the Building by Defendant's wrongful conduct, without consideration, compensation or legal cause.

129. Defendant was enriched thereby.

130. It would be inequitable and unconscionable for Defendant to continue to enjoy the benefits of possession and use of Plaintiffs' Building without compensating them therefor.


## COUNT VI
## UNJUST ENRICHMENT- RENTAL INCOME

131. Plaintiffs incorporate by reference all the allegations above.

132. Plaintiffs were deprived of 83 years of rents generated from the Building (1938-2020). This deprivation was caused directly by Defendant who stole the Building in violation of international law.

133. Defendant is the successor state of the Third Reich and the GDR.

134. The Plaintiffs were never compensated for the lost rents.

135. The Defendant was enriched thereby.

136. It would be inequitable and unconscionable for Defendant to continue to enjoy the benefits of possession and use of rents without compensating them therefor.


## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of Plaintiffs against Defendant, as follows:

(a) Award Plaintiffs compensatory damages, and/or compensation for unjust enrichment, in an amount to be proven at trial, for the Defendant's unlawful conduct, as alleged hereinabove;

(b) Award Plaintiffs pre-judgment and post-judgment interest;

(c) Award Plaintiffs the costs of this action, including attorney's fees and all reasonable expenses; and

(d) Grant such other and further relief as shall be deemed just and proper by the Court.

<u>Date</u>: December 10, 2020.

Respectfully submitted,

/s/ *Lawrence Marc Zell*
_____
Lawrence Marc Zell
(DC Bar # 959437)
Noam Schreiber, *pro hac vice to be filed*
**ZELL & ASSOCIATES**
**INTERNATIONAL ADVOCATES LLC**
14 Penn Plaza
225 West 34th Street, 9th Floor
New York, New York 10122

34 Ben Yehuda St.
15th Floor
Jerusalem, Israel 9423001
E-mail: mzell@fandz.com
E-mail: Schreiber.noam@gmail.com

*Counsel for Plaintiffs*