# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SAMI AMBAR, *et al.*,<br>　　　　Plaintiffs,<br>　　v.<br>FEDERAL REPUBLIC OF GERMANY,<br>　　　　Defendant | Civil Action No. 20-3587 (CKK) |

## MEMORANDUM OPINION
(March 15, 2022)

This case arises from the alleged November 27, 1941 expropriation of a building located in Berlin, Germany (the "Building") by the Nazi regime.  The Building was owned by Salo Feuerwerk who was Jewish and resided in Austria.  Plaintiffs are Mr. Feuerwerk's grandchildren, Sami Ambar, Laila Ambar, Shlomit Abrahamoff, Ariela N. Abrahamoff, who bring this action against Defendant Federal Republic of Germany ("Germany") alleging that Germany is in wrongful possession of rent and sale proceeds related to the expropriated Building.  In its pending [9] Motion to Dismiss, Germany argues that it is immune from suit pursuant to the Foreign Sovereign Immunities Act ("FSIA").  28 U.S.C. §§ 1602–1611.  Plaintiffs oppose Germany's motion, invoking the "expropriation exception" to the FSIA, which confers jurisdiction for claims involving property rights taken in violation of international law when there exists a connection with a commercial activity carried on in the United States.  *Id.* § 1605(a)(3).

Upon review of the pleadings,[1] the relevant legal authority, and the record as a whole, the Court concludes that the Complaint's factual allegations make out a legally valid claim that the

---

[1] The Court's consideration has focused on the following:
- Defendant's Motion to Dismiss ("Def.'s Mot."), ECF No. 9;
- Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendant's Motion to Dismiss ("Pls.' Opp'n"), ECF No. 11;
- Defendant's Reply Memorandum of Points & Authorities in Support of Motion to Dismiss ("Def.'s Reply"), ECF No. 12; and

"expropriation exception" to the FSIA applies, and therefore Germany is not immune from suit in this case. Accordingly, the Court shall **DENY** Germany's Motion to Dismiss.

## I.      BACKGROUND

In 1924, Mr. Feuerwerk, a Jewish Austrian citizen who had resided in Vienna, Austria since at least 1914, purchased the Building in Berlin, Germany. Compl. ¶¶ 1, 5, 41, ECF No. 1. As the Building's sole owner, Mr. Feuerwerk collected rents from the Building from 1924 to 1937. *Id.* ¶¶ 43, 44.

Following its rise to power in Germany, *see generally id.* ¶¶ 22–28, the Nazi regime enacted a series of laws designed to diminish the rights of German Jews, known as the Nuremberg Laws. *Id.* ¶¶ 29, 30. One such law, the Reich Citizenship Law, enacted in 1935, stripped German Jews of citizenship and downgraded their legal status to one of "nationals," distinct from "Reich citizens." *Id.* ¶ 30. It is not disputed that at the time of the Reich Citizenship Law of 1935, Mr. Feuerwerk was a citizen and resident of Austria. *Id.* ¶¶ 1, 45; Def.'s Mot. at 6.

In 1937, Mr. Feuerwerk fled from Austria to Romania. Compl. ¶ 45. In March 1938, Austria was annexed by Nazi Germany, beginning a period known as the "*Anschluss*."[2] *Id.* ¶ 35. In July 1938, Nazi Germany declared all Austrian citizens to be nationals of Germany, retroactive to March 1938. Pls.' Opp'n at 8 (citing Def.'s Mot. at 6).

In March 1940, Mr. Feuerwerk and his family fled Romania to what was then the British Mandate of Palestine. Compl. ¶ 55.

---

- Plaintiffs' Notice of Supplemental Authority ("Pls.' Suppl. Auth."), ECF No. 13.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. See LCvR 7(f).

[2] In using the term "*Anschluss*," the Court refers to the time period of German occupation of Austria between 1938 and 1945.

On November 25, 1941, Germany issued a decree denationalizing German Jewish nationals residing abroad and confiscating all of their property, pursuant to the Reich Citizenship Law of 1935.  Pls.' Opp'n at 9 (citing Def.'s Mot. at 6).

On or about November 27, 1941, Germany took possession of Mr. Feuerwerk's Building, Compl. ¶ 57, and in January 1942, registered the Building in the name of the German Reich.  *Id.* Mr. Feuerwerk died in Mandatory Palestine in April 1942.  *Id.* ¶ 1.

Plaintiffs contend that following the downfall of the Nazi government, ownership of the Building passed to the German Democratic Republic and then to the Federal Republic of Germany, each of which collected rents from the Building.  *See id.* ¶¶ 58–71.  According to Plaintiffs, Germany sold the Building on January 3, 2006.  *Id.* ¶ 71.  Plaintiffs allege that Germany commingled the funds from the sale of the Building with its general revenue, and that the commingled funds were subsequently used in the United States to purchase military equipment, maintain bank accounts and bank deposits, sell and purchase U.S. treasury bonds, and issue German bonds and other financial instruments to U.S. investors.  *Id.* ¶¶ 21, 71.

Plaintiffs previously sought to regain ownership of the Building pursuant to a treaty between Austria and the German Democratic Republic in an administrative court in Berlin. *See generally id.* ¶¶ 73–96.  Plaintiffs have been unsuccessful in their efforts to regain ownership of the Building and/or to recoup proceeds from the 2006 sale.  *Id.* ¶ 95.

Plaintiffs now bring the following six claims against Germany: international expropriation (Count I); genocide in violation of the law of nations (Count II); conversion of proceeds of the sale (Count III); conversion of the rental income (Count IV); unjust enrichment from the proceeds of the sale (Count V); and unjust enrichment from the rental income (Count VI).  Plaintiffs seek,

among other things, compensatory damages and/or compensation for unjust enrichment for the taking of the building.

Germany moved to dismiss the Complaint, contending that it is entitled to sovereign immunity. *See* Def.'s Mot. That motion is now ripe for the Court's consideration.

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may move for dismissal based on "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). When a foreign sovereign defendant moves for dismissal under Rule 12(b)(1) on the grounds of sovereign immunity, initially, the plaintiff bears the burden of overcoming the presumption of sovereign immunity "by producing evidence that an [FSIA] exception applies." *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). After the plaintiff has met this initial burden of production, the foreign sovereign defendant bears the "ultimate burden of persuasion" to show that the alleged exception to sovereign immunity does not apply. *Id.*

In resolving a motion to dismiss pursuant to Rule 12(b)(1), the court can, and often must, go beyond the allegations in the complaint. "Where a motion to dismiss a complaint 'present[s] a dispute over the factual basis of the court's subject matter jurisdiction … the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." *Feldman v. Fed. Deposit Ins. Corp.*, 879 F.3d 347, 351 (D.C. Cir. 2018) (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). Instead of merely relying on the truth of the facts alleged in the complaint, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.* (quoting *Phoenix Consulting*, 216 F.3d at 40).

4

### III.   DISCUSSION

Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611, "a foreign state is presumptively immune from the jurisdiction of United States courts," and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Id.* (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989) (internal quotation marks omitted)). Because "subject matter jurisdiction in any such action depends on the existence of one of the [FSIA's] specified exceptions . . . [a]t the threshold of every action in a District Court against a foreign state . . . the court must satisfy itself that one of the exceptions applies." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983). "In other words, U.S. courts have no power to hear a case brought against a foreign sovereign *unless* one of the exceptions applies." *Diag Human S.E. v. Czech Republic–Ministry of Health*, 64 F. Supp. 3d 22, 30 (D.D.C. 2014), *rev'd on other grounds* 824 F.3d 131 (D.C. Cir. 2016).

The FSIA's exceptions to sovereign immunity are narrowly construed. *Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 713 (2021) ("Germany's interpretation of the exception is also more consistent with the FSIA's express goal of codifying the restrictive theory of sovereign immunity[.]"); *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1320 (2017) (discussing the overarching framework of the "restrictive theory" in codifying sovereign immunity).

Plaintiffs assert that this Court has jurisdiction under the FSIA's "expropriation exception," 28 U.S.C. § 1605(a)(3). Compl. ¶ 15. The FSIA's "expropriation exception" allows a party to proceed with a claim against a foreign sovereign:

> in which rights in property taken in violation of international law are
> in issue and that property or any property exchanged for such
> property is present in the United States in connection with a
> commercial activity carried on in the United States by the foreign
> state; or that property or any property exchanged for such property
> is owned or operated by an agency or instrumentality of the foreign
> state and that agency or instrumentality is engaged in a commercial
> activity in the United States[.]

28 U.S.C. § 1605(a)(3).  As such, to satisfy the FSIA's "expropriation exception," a plaintiff must demonstrate that (1) "rights in property" are "in issue"; (2) the property right was "taken in violation of international law"; and (3) there is a commercial activity nexus such that property exchanged for the taken property "is present in the United States in connection with a commercial activity carried on in the United States by the foreign state."[3]  *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005).  Here, there is no dispute that "rights in property" are "in issue" to satisfy the first prong of the FSIA's expropriation exception.  Accordingly, the Court must consider only whether Plaintiffs have alleged that the taking of the Building was "in violation of international law" and whether there is a nexus between the taking (and subsequent sale) of the Building and Germany's commercial activity in the United States.  Based on the present record, the Court finds that Plaintiffs' allegations are sufficient to establish both remaining prongs of the FSIA's expropriation exception.

## A.  Taken in Violation of International Law

Germany contends that Plaintiffs failed to establish that the Berlin building was "taken in violation of international law" because Mr. Feuerwerk was a German national.  As Germany correctly notes, a "'taking of property' could be 'wrongful under international law' only where a

---

[3] The "commercial activity" prong of the expropriation exception can also be satisfied by demonstrating that the taken property or any property exchanged for the taken property "is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."  28 U.S.C. § 1605(a)(3).  The parties here do not apply this particular commercial-activity nexus.

state deprived 'an alien' of property." *Philipp*, 141 S. Ct. at 712 (quoting Restatement (Second) Of Foreign Rels. L. U.S. § 185 (Am. L. Inst. 1965)). "[T]he phrase 'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation and thereby incorporates the domestic takings rule." *Id.* at 715. "This 'domestic takings rule' assumes that what a country does to property belonging to its own citizens within its own borders is not the subject of international law." *Id.* at 709.

Germany's position is that Mr. Feuerwerk was a German national, so any expropriation of the Building constituted a "domestic" taking that was not in violation of "international" law. *See* Def.'s Mot. at 5. Plaintiffs argue that Mr. Feuerwerk was *not* a German national at the time the Building was confiscated by the Nazis, Compl. ¶ 103, and therefore the Building *was* "taken in violation of *international* law," § 1605(a)(3) (emphasis added). For the following reasons, the Court finds that Plaintiffs have adequately alleged that the alleged taking of the Building was in violation of *international* law because Mr. Feuerwerk was not a German national.

To reach this conclusion, the Court must consider: (1) whether Austrian or German law applies; and (2) whether the Court should apply the law applicable at the time of the alleged expropriation of the Building or apply post-World War II laws retroactively. Plaintiffs ask the Court to consider application of either Austrian law retroactively or German law at the moment of the taking to find that Mr. Feuerwerk was not a German national at the time of the taking. Germany contends that an analysis of post-war German law applies retroactively, and application of such law directs that Mr. Feuerwerk was a German national.

As to the first consideration, the Court looks to German law to determine Mr. Feuerwerk's nationality. Under general principles of international law, "[i]t is for each State to determine under its own law who are its nationals[,]" and "[a]ny question as to whether a person possesses the

nationality of a particular State shall be determined in accordance with the law of that State."
Convention on Certain Questions Relating to the Conflict of Nationality Laws, art. 1, 2, Apr. 12,
1930, 179 U.N.T.S. 89; *see also* European Convention on Nationality, art. 3, Nov. 6, 1997, E.T.S.
No. 166 ("Each State shall determine under its own laws who are its nationals.").  In other words,
the question of whether Mr. Feuerwerk was a German national is a question under German law.
As the crux of the parties' dispute is whether Mr. Feuerwerk is a German national, German law
supplies the relevant framework.

Having concluded that German law supplies the appropriate framework to analyze Mr.
Feuerwerk's nationality, the Court next considers whether to apply German law as it stood at the
time of the alleged expropriation of the Building in 1941 *or* to apply post-Nazi regime German
law retroactively.  Plaintiffs argue that if German law is to be considered, then German law at the
time of the taking of the Building should be the relevant analysis, whereas Defendant contends
that only German law retroactively should apply.  Neither party cites binding legal authority
directing which approach is correct, and the Court has identified none.[4]  As set forth below, from
either temporal perspective, Plaintiffs have the better argument that Mr. Feuerwerk was *not* a
national of Germany, and therefore have sufficiently alleged that the Building was taken in
violation of *international* law.

### 1.  German Law at the Time of the Taking of the Building

Under German law at the time of the taking in 1941, Germany's annexation of Austria was
considered legal.  *See* Def.'s Mot. at 6.  Following annexation, Germany issued a decree in July

---

[4] In *Simon v. Republic of Hungary* ("*Simon 2021*"), the court considered whether the facts alleged gave rise
to a reasonable inference that the individuals were not Hungarian nationals "*at the time the property was
expropriated from them*." No. 10-cv-1770, 2021 WL 6196995, at *37 (D.D.C. Dec. 30, 2021) (emphasis
added).  However, that court was not confronted with the same arguments raised by Germany in this case
about retroactive application of later laws.

1938 declaring all Austrian citizens to be nationals of Germany retroactive to March 1938, the start of its annexation.  Therefore, under German law, Mr. Feuerwerk became a German national in 1938.  However, he was denationalized by the 11th Decree issued by Germany on November 25, 1941.  The 11th Decree denationalized German Jewish nationals residing abroad and allowed confiscation of their property, pursuant to the Reich Citizenship Law of 1935 which degraded the legal status of German Jews.  Def.'s Mot. at 6; Pls.' Opp'n at 9.  Mr. Feuerwerk fled Austria to Romania in 1937 and, by the time the denationalization decree was issued, he was residing in British Mandatory Palestine.  Compl. ¶¶ 45, 55.  Given that Nazi regime allegedly expropriated Mr. Feuerwerk's building in Berlin two days after the decree, *id.* ¶ 57; Pls.' Opp'n at 9, Germany would have considered Mr. Feuerwerk to be a denationalized German Jewish national residing abroad.  Therefore, under Germany's own laws at the time of the taking, Mr. Feuerwerk was not a German national.[5]

United States courts at the time also considered people like Mr. Feuerwerk to be non-German nationals.  For example, in *United States ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898 (2d Cir. 1943), the Second Circuit considered whether the relator, a Jewish man who was a "naturalized citizen of Austria" was a "German citizen" for purposes of the Alien Enemy Act.  *Id.* at 900, 901–02.  At the time of Germany's 1938 decree granting Germany citizenship to all Austrian citizens, the relator in *Schwarzkopf* was a resident of the United States.  *Id.* at 900.  Although the court noted that the United States had never accorded *de jure* or *de facto* recognition of Germany's

---

[5] *See e.g.*, Joachim Stern and Gerd Valchars, EUDO Citizenship Observatory, Country Report: Austria 7 (2013) ("The 1938 implementation of the Nuremberg Race Laws of 1935, especially the 'Law on the protection of German blood and honour' also took effect in annexed Austria in 1938 and provided inter alia: 'A Jew cannot be a Reich citizen.  He is neither entitled to vote on political matters nor may he hold public office'.  A series of discriminatory amendments to the citizenship law followed and peaked in the 11th Decree on Citizenship: All people considered Jews outside the territory of the German Reich collectively lost their nationality, their assets became property of the Reich.").

annexation of Austria, it concluded that "under generally accepted principles of international law Germany could impose citizenship by annexation (collective naturalization) *only on those who were inhabitants of Austria in 1938*." *Id.* at 901–02 (emphasis added).  As with the relator in *Schwarzkopf*, Mr. Feuerwerk did *not* reside in Austria as of 1938, and therefore would not have been a "German" national.[6]

### 2.   Application of Later German Law Retroactively

In support of its argument that Mr. Feuerwerk was a German national at the time of the taking, Germany contends that in 1968, it declared the 11th Decree denationalizing German Jews retroactively null and void.  Specifically, Germany relies on the German Constitutional Court's application of the Radbruch Formula in 1968, which declared that the Reich Citizenship Law and denationalization decree as applied to German Jews must not be recognized as valid law because they "contradict fundamental principles of justice so clearly that any judge who wanted to apply them or to recognize their legal consequences would pronounce injustice instead of right" and that those regulations are a "contradiction to justice that has reached such an unbearable level that it must be considered null and void ab initio."  BVerfGE 23, 98 BvR 557/62, Feb. 14, 1968, https://opinioiuris.de/entscheidung/1553 (translated quotes from Def.'s Mot. at 7).  In other words, Germany asks the Court to find that Mr. Feuerwerk would have been a German national by virtue

---

[6] Germany suggests that the legal theory espoused in *Schwarzkopf* (that only inhabitants who remain in the annexed state are deemed nationals) "is inapplicable under US law where a statute or regulation does not limit the application of new nationality to a specific territory, and instead applies to all citizens of the annexed state regardless of their whereabouts."  Def.'s Reply at 4.  It is not entirely clear what point Germany is raising with this argument.  Germany cites an example the United States' annexation of Hawaii and Puerto Rico, noting that the United States did not limit a grant of citizenship only to the individuals physically present in those territories.  These comparisons are not particularly relevant.  With respect to both Hawaii and Puerto Rico, the United States specifically enacted statutes applying citizenship to Hawaiians and Puerto Ricans who were not physically present in those territories.  *See* 8 U.S.C. §§ 1402, 1405.  Given that specific statutes carved out citizenship for Hawaiians and Puerto Ricans whereas no such statutes are applicable in *Schwarzkopf* or this present case, Germany undermines its own argument by providing examples that are consistent with the legal theory of *Schwarzkopf*.

of the *Anschluss* recognizing Austrian residents as Germans *and* the retroactive nullification of the Nazi-era laws which denationalized Jews.

Germany is asking the Court to apply *some* retroactive laws in a way that allows them to benefit from *some* Nazi-era laws while disclaiming others.  But adopting this proposed "selective retroactivity"—recognizing the validity of the *Anschluss* while nullifying the denationalization laws—runs counter to the "fundamental principles of justice" pronounced by the German Constitutional Court.  Principles of international law would also frown upon the selective retroactivity argued by Germany. *Cf*. ICJ Judge Stephen M. Schwebel, "Clean Hands, Principle," in Max Planck Encyclopedia of International Law (2013) (discussing *Meuse Diversion of Water Case (Netherlands v. Belgium)*, Judgment of June 28, 1937, 1937 P.C.I.J. ser. A/B No. 70 ("'He who seeks equity must do equity' is a principle applicable in international law. . . . [I]n a proper case and with scrupulous regard for the limitations which are necessary, a tribunal bound by international law ought not to shrink from applying a principle of such obvious fairness.") (Opinion of Hudson, J. ¶¶ 323–24)).

Moreover, applying later German law retroactively may also acknowledge *Austrian* citizenship for Mr. Feuerwerk.  Although Germany asks the Court to consider the retroactive nullification of the Reich Citizenship Law and 11th Decree, it does not address the retroactive application of other laws.  In 1987 for example, German courts acknowledged the validity of Austria's 1945 Transitional Citizenship Law. BVerfGE 4, 322 1 BVR 284/54, May 12, 1987.  In a case involving an extradition request from Austria, Germany declared that "[a]ll persons who would have been Austrian citizens on 27 April 1945 if the Austrian Nationality Law had remained in force without interruption have, as of that date, lost their German nationality resulting from the

'annexation' (Anschluß)." *Id.*[7]  The Austrian Proclamation of Independence of April 27, 1945,

declared that the *Anschluss*, "forcibly imposed upon the Austrian People is null and void."

Proclamation of the Second Republic of Austria of April 27, 1945, Art. II (in German).  The

proclamation by itself "would probably have sufficed in order to carry out the idea of Austria's

legal continuity in regard to nationality."  Robert E. Clute, The International Legal Status of

Austria 1938-1955 68 (Martinus Nijhoff, The Hague, 1962) (hereinafter "Clute").  Austrian

lawmakers, however, also passed the Transitional Citizenship Law of July 10, 1945, which further

defined Austrian citizenship retroactive to those who would have possessed Austrian citizenship

from March 13, 1938, to April 27, 1945.  *Id.* at 69.

Germany points to the language of the Transitional Citizenship Law as evidence that Mr.

Feuerwerk did not regain Austrian citizenship because he was not alive in 1945.  That act states in

relevant parts that Austrian citizens are, "as of April 27, 1945" or "from April 27, 1945," those

persons who possessed Austrian citizenship from March 3, 1938.[8]  The fact that Austria passed

new laws in 1945 declaring citizenship rather than merely declaring the nullification of the 1938

German laws and reverting to prior citizenship laws seems to indicate the possibility that April 27,

1945 is an effective boundary date.  Germany notes that the

> Austrian government could easily have used the May 29
> Announcement [repealing the German Legal Provisions in the Field
> of Citizenship] to declare the Ordinance of Nationality in the State
> of Austria of July 3, 1938 *invalid ab initio*, but, it chose April 27,
> 1945 as the effective date, keeping the German nationality for all
> Austrians intact for the period between March 13, 1938 and April
> 27, 1945.

---

[7] English translated version found at https://law.utexas.edu/transnational/foreign-law-translations/
german/case.php?id=599.

[8] The text of the law is in German and depending on the translation "as of" is used whereas others write
"from."  *See* Def.'s Reply (using "as of"); Clute at 69 (using "from").

Def.'s Reply at 6.  The implication from this argument is that Mr. Feuerwerk never regained Austrian citizenship on April 27, 1945, because he died in 1942 as a "German."  The German counterargument may seem textually convincing.  *See* Clute at 69 (acknowledging that the existence of the Transitional Citizenship Law raises some doubt in the theory of continuity).  But regardless of new laws on citizenship, Austrian law does not disregard the principle of legal continuity[9] and still intends to retroactively claim continuity during this period.  *See* Clute at 141–52 (discussing several cases from the Austrian Supreme Administrative Court, Verwaltungsgerichthof); *see also* Verwaltungsgerichtshof [VwGH] [Administrative Court of Justice] Sept. 6, 1995, 94/01/0787 [VwSlg] 14310 A/1995 (Austria) (in German) (citing the works of scholars Seidl-Hohenveldern and Heinl finding that the Supreme Administrative Court applied principles of international law to treat the July 3, 1938, Nationalization Decree as "irrelevant" and void under Austrian law, as applied to a child of an Austrian mother and ethnic German father from the South Tyrol region who was forcibly made a German citizen during the *Anschluss*).

Austrian law intends to state retroactively that individuals like Mr. Feuerwerk were always citizens of Austria.  Clute at 68–71.  With a declaration indicating the intent to impose the theory of legal continuity, Austria would have no reason to consider an individual who was an Austrian citizen before 1938 to be a German rather than as a continuous Austrian simply because he or she

---

[9] Under Austrian law, the *Anschluss* "did not affect the continuity of Austria."  Clute at 68.  The Austrian authorities take the position that the *Anschluss* was a legal nullity that did not affect Austrian nationality during the time of the German occupation.  *Id.* at 68–71.  Under the theory of continuity, those who were Austrian prior to the *Anschluss* remained Austrian throughout the Nazi occupation.  Germany argues that an Austrian ordinance declared German nationality for all of its citizens in 1938. The Ordinance on Nationality in the State of Austria of 3 July 1938 (Verordnung über die Staatsangehörigkeit im Lande Österreich, RGB1. I, p. 790, http://www.documentarchiv.de/ns/1938/deutsche-staatsangehoerigkeit-ost_vo.html) states in § 1(2) that "there shall exist only German nationality" ("Es gibt nur noch die deutsche Staatsangehörigkeit (Reichsangehörigkeit)").  It is difficult, however, to see how this ordinance is representative of Austrian law at the time considering that the annexation occurred in March of 1938, prior to the Ordinance.  This law seems to be declarative of German law rather than Austrian law at the time especially since Germany considers Austria to have ceased to exist in March of 1938.

died in between 1938 and 1945.  Austria also declared automatic citizenship for individuals, rather than requiring them to reclaim citizenship in 1945.  In contrast, current birthright laws in Austria explicitly require those who want to claim Austrian citizenship to declare and register.[10]  If Austria had intended that only those who survived the war would be considered citizens of Austria, it would have imposed an additional requirement to reclaim citizenship rather than declaring it.  This intention is consistent with the intention to maintain legal continuity.

Further, in creating any sort of inconsistency with legal continuity, it does not appear that these laws intended to exclude individuals like Mr. Feuerwerk who was an Austrian citizen prior to 1938.  Even if the "use of the subjunctive mood might presuppose that the [Transitional Citizenship Law] was not in effect" between 1938 and 1945, the evidence of continuity is to be found in the fact that "the gain and loss of nationality during the Anschluss was regulated by the Austrian Nationality Law of 1925."  Clute at 69.  If anything, the specific wording of retroactive Austrian laws only showed hesitancy toward full nullity because of Austrian lawmakers' concerns with nationality based on marriage.  The lawmakers and subsequent court cases only applied the strict reading of the post-war citizenship laws and indicated that the primary distinction in creating these new citizenship laws were in cases addressing the Austrian women who married Germans during the *Anschluss*.  *See* Clute at 70.  The post-war laws specifically "provided that if a person were already resident in Austria prior to the Anschluss, such residence during the Anschluss could be counted toward the requirements for naturalization" whereas "residence in Austria during the period of the Anschluss did not count toward the residence requirements for naturalization in cases where such residence was not commenced until after March 13, 1938."  Clute at 69 n.20.  Mr.

[10] *See e.g.*, Austrian Embassy Washington, *Austria Extends Citizenship to Descendants of Victims of Nazi Persecution* (Sept. 19, 2019), https://www.austria.org/the-latest/2019/10/7/austrian-citizenship-descendants-victims-nazi-persecution ("Eligible descendants will be able to *apply* for Austrian citizenship . . ." (emphasis added)).

14

Feuerwerk would not fall under this latter category because he had always been a citizen of Austria even prior to the period between 1938 and 1945, which is what the marriage cases are concerned with.

The application of retroactivity of German law in acknowledging Austria's laws faces counterarguments regarding the timing of "would have been Austrian citizens" in 1945 as outlined above. However, since the German court is retroactively removing German nationality resulting from the *Anschluss*, Mr. Feuerwerk's supposed German nationality resulting from the *Anschluss* would be removed as well. Although Mr. Feuerwerk died in 1942, he would have been an Austrian citizen in 1945 when the Austrian Nationality Law remained in force.

***

In sum, the Court finds that application of German law under the temporal framework posited by either party results in finding that Mr. Feuerwerk was *not* a German national when the Building was expropriated. Accordingly, the Court finds that Plaintiffs have sufficiently demonstrated that the alleged expropriation of the Building was not a "domestic" taking, but instead a taking in violation of international law.

### B. Commercial Activity

The Court must next consider whether Plaintiffs' Complaint satisfies the "commercial activity" prong of the FSIA's expropriation exception. *See Peterson*, 416 F.3d at 86. The FSIA defines a "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." § 1603(d).

15

Courts have narrowly construed the FSIA's exceptions to sovereign immunity and therefore interpret the term "commercial activity" restrictively. *See Exxon Mobil Corp. v. Corporación Cimex S.A.*, ---F. Supp. 3d ---, 2021 WL 4709566, at *2 (D.D.C. Oct. 8, 2021) (citing *Philipp*, 141 S. Ct. at 713 ("[T]he commercial activity exception 'comport[s] with the overarching framework of the restrictive theory.'")). The "touchstone of the commercial activity exception" is not based on "the parties' relationship to one another." *Id.* at *4. "Rather, it is whether commercial activity forms the basis or foundation for a claim; whether commercial activity gives rise to the elements ... that if, proven, would entitle a plaintiff to relief; and whether the gravamen of the complaint sounds in commercial activity." *Id.* (cleaned up) (citing *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 36 (2015); *Nelson*, 597 U.S. at 357).

Another court in this jurisdiction recently considered the meaning of "commercial activity," as applied to claims brought by plaintiffs seeking restitution for property seized from them during the period of Nazi rule. *Simon 2021*, 2021 WL 6196995. In *Simon 2021*, the plaintiffs were Hungarian Jews who sought restitution for property seized from them by the Hungarian government. In that case, the court "credited the sufficiency of plaintiffs' allegations that Hungary engages in commercial activity in the United States by, *inter alia*, issuing certain SEC-regulated bonds and purchasing military equipment." *Simon 2021*, 2021 WL 6196995, at *10. The court concluded that the alleged "commercial activity"— "Hungary's possession and use of commingled proceeds from the sale of expropriated property"—was sufficient. *Id.* Similarly, Plaintiffs here allege that Germany commingled the proceeds of the sale of the Building with its general budget revenues and then used those funds for "commercial activities" in the United States, including purchasing military equipment, maintaining bank accounts and bank deposits, sale and purchase of U.S. treasury bonds, and issuance of German bonds and other financial instruments to U.S.

investors. *See* Compl. ¶ 21; Pls.' Opp'n at 34–35. As did the court in *Simon 2021*, the Court finds that these allegations sufficiently state that Germany has engaged in commercial activity with the United States using property exchanged for Mr. Feuerwerk's Building.

In *Simon 2021*, the court applied a "plausibility" standard to determine whether the commercial nexus element of the FSIA's expropriation exception was satisfied. 2021 WL 6196995, at *10 (*quoting Simon v. Republic of Hungary* ("*Simon 2020*"), 443 F. Supp. 3d 88, 104 (D.D.C. 2020)) ("With respect to Hungary, the Court first found that the Second Amended Complaint presented allegations of Hungary's possession and use of commingled proceeds from the sale of expropriated property, sufficient to 'raise a plausible inference that' Hungary possesses such property, and that Hungary failed to defeat that inference."). Germany asks the Court to apply a stricter pleading standard, relying on *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312 (2017) and *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020). Germany argues that *Helmerich* instituted "a new and more demanding standard . . . that jurisdictional facts are sufficiently pled 'only if they do show (and not just arguably show)' the facts necessary to support jurisdiction." Def.'s Reply at 11 (*quoting Helmerich*, 137 S. Ct. at 1324). Germany further points to *Owens* to affirm the *Helmerich* standard "requiring a plaintiff to prove the facts supporting the court's jurisdiction under the FSIA, rather than simply to make a 'non-frivolous' claim to that effect. *Owens*, 864 F.3d at 779 (*citing Helmerich*, 137 S. Ct. at 1316).[11]

---

[11] In *Owens*, the Court considered the FSIA terrorism exception, 28 U.S.C. § 1605(a)(7) rather than subsection (a)(3). 864 F.3d at 764.

Germany's argument that *Helmerich* and *Owens* created a "heightened standard" for pleading the "commercial activity" prong of the FSIA's "expropriation exception" is misplaced.[12] The Court in *Helmerich* explicitly applied its "more demanding standard" to the "rights in property taken in violation of international law" portion of § 1605(a)(3) rather than the "connection with a commercial activity" prong. *Helmerich*, 137 S. Ct. at 1314. Moreover, the court in *Helmerich* held "that plaintiffs asserting jurisdiction pursuant to the FSIA's expropriation exception have to do more than advance a 'nonfrivolous argument,' . . . thereby rejecting the 'exceptionally low bar' applied by the D.C. Circuit when FSIA's jurisdictional question overlaps with the merits question posed by a claim." *Simon 2020*, 443 F. Supp. 3d 88, 102 n.9 (*quoting Helmerich*, 137 S. Ct. at 1318, 19). As the *Simon 2020* court noted in response to an argument similar to the one made by Germany here, although the "non-frivolous" pleading standard was overruled, the plausibility standard is not an incorrect application of the standard set out in *Helmerich*. *Id.* Accordingly, while Germany argues *Simon 2021* and *Helmerich*/*Owens* are at odds regarding the applicable pleading standard, the two are consistent. The plausibility standard set out in *Simon 2021* is more than non-frivolous and is a correct application of the heightened standard required by *Helmerich* and *Owens*.

Here, the Court finds that the facts alleged by Plaintiffs that Germany has engaged in commercial activity with the United States using property exchanged for the expropriated Building satisfy the plausibility standard explained by the court in *Simon 2021*—which also satisfies the "non-frivolous" standard proposed by Germany.

---

[12] Following *Owens* and prior to *Simon 2021*, the United States Court of Appeals for the District of Columbia Circuit has applied a "plausibility" standard in analyzing immunity exceptions under the FSIA. *See Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 401 (D.C. Cir. 2018); *EIG Energy Fund XIV v. Petroleo Brasileiro*, 894 F.3d 339, 345 (D.C. Cir. 2018); *Valambhia*, 964 F. 3d 1135, 1139.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' allegations sufficiently invoke the FSIA's expropriation exception, overcoming Germany's sovereign immunity. Accordingly, the Court shall **DENY** Germany's Motion to Dismiss.  An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

**Date**: March 15, 2022